612 So.2d 561 (1993)
THE FLORIDA BAR, Complainant,
v.
Ellis S. SIMRING, Respondent.
Nos. 77351, 78243, 78898 and 79510.
Supreme Court of Florida.
January 21, 1993.
Rehearing Denied February 24, 1993.
*562 John F. Harkness, Jr., Executive Director and John T. Berry, Staff Counsel, Tallahassee, and Kevin P. Tynan, Bar Counsel and Linda J. Amidon, Co-Bar Counsel, Fort Lauderdale, for complainant.
Ellis S. Simring, pro se, Fort Lauderdale.
Neil F. Garfield, Co-counsel of Garfield & Associates, P.A., Fort Lauderdale, for respondent.
PER CURIAM.
The Florida Bar v. Simring, No. 77,351 and The Florida Bar v. Simring, No. 78,243 are before this Court on complaints from The Florida Bar and the referee's report finding the respondent, Ellis S. Simring, guilty of professional misconduct and recommending an eighteen-month suspension. We also have The Florida Bar v. Simring, No. 78,898, where this Court found the respondent guilty of contempt for violating this Court's order, dated January 14, 1991, temporarily suspending him, and The Florida Bar v. Simring, No. 79,510, in which the referee found the respondent guilty of contempt for violating this Court's temporary suspension order.[1] The Florida Bar petitions for review of the referee's findings and seeks disbarment. We have jurisdiction based on article V, section 15 of the Florida Constitution. We agree with The Florida Bar that the respondent should be disbarred from the practice of law.
In The Florida Bar v. Simring, No. 77,351, The Florida Bar charged the respondent with five counts of trust account violations resulting from the respondent's misappropriation of client funds, failure to maintain proper trust account records, and the commingling of personal and trust account funds. The referee made the following findings as to each count:

Count I: Trust Account Records
A Florida Bar auditor conducted an examination of the respondent's trust account for the period beginning January 1, 1989, and ending September 30, 1990, and the auditor found that the respondent did not maintain complete trust account records. In order to conduct the examination, the auditor was required to create individual client ledger cards, bank reconciliations, and a client liability list for specific dates. When the auditor requested the respondent's client files, the respondent replied: "I threw them all away."
The auditor's examination revealed significant trust account shortages between the balance of the respondent's trust account and the amount of client liabilities owed for the period of March 1989 to September 1990. The examination also revealed *563 that in November and December of 1989 the respondent's trust account showed a surplus between the trust account balance and client liabilities. However, by January 1990 significant shortages reappeared in the trust account and continued until the respondent closed his trust account. The auditor's examination showed that the shortages in the trust account fluctuated between a low of $16,281.92 to a high of $67,727.61. The referee concluded that the respondent had caused these fluctuations by commingling his personal and trust account funds.
The referee found the respondent guilty of violating Rules Regulating The Florida Bar 3-4.2 (a lawyer shall not violate the Rules of Professional Conduct), 4-1.15(b) (a lawyer shall promptly deliver to the client any funds which the client is entitled to receive and must provide a prompt accounting), 4-1.15(d) (a lawyer shall comply with the Rules Regulating Trust Accounts), 4-8.4(a) (a lawyer shall not violate the Rules of Professional Conduct); and 5-1.1 (money entrusted to a lawyer for a specific purpose must only be used for that purpose).
The referee, however, found that The Florida Bar had failed to establish by clear and convincing evidence that the respondent had intentionally misappropriated his clients' funds. The referee specifically stated:
Primarily because of Respondent's improper trust accounting techniques (lack of records and documentation) [The Florida Bar's] case amounted to merely establishing "paper shortages" in the trust account. Respondent cannot be said to have committed theft unless it is proven that he has taken client's property with intent to deprive the client of the right to the property. The evidence provided by [The Florida Bar] falls short of establishing those requisite elements. The Petitioner seeks to raise a presumption of theft by repeated instances of shortages in the trust account over an extended period of time. However, [The Florida Bar's] case must fail in that regard, especially where no injured party was presented, no client complained to the Bar[,] nor was any evidence presented that any client in fact failed to receive money due.
Thus, the referee found the respondent not guilty of violating Rules Regulating The Florida Bar 3-4.4 (commission by a lawyer of any act which is unlawful or contrary to honesty and justice may be cause for discipline); 3-4.4 (criminal misconduct is cause for discipline); 4-8.4(b) (a lawyer shall not commit a criminal act); and 4-8.4(c) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit or misrepresentation).

Count II: Deposit of Funds in Non-interest-bearing Account
The referee found that the respondent failed to deposit short term funds into an interest-bearing trust account for the period beginning January 1, 1989 and ending September 30, 1990. Thus, the referee found the respondent guilty of violating Rules Regulating The Florida Bar 3-4.2 (a lawyer shall not violate the Rules of Professional Conduct), 4-1.15(d) (a lawyer shall comply with the Rules Regulating Trust Accounts), 4-8.4(a) (a lawyer shall not violate the Rules of Professional Conduct), and 5-1.1(d) (nominal or short term client funds must be deposited in an interest-bearing trust account).

Count III: Commingling of Funds
The referee found through the auditor's examination and the parties' stipulation that the respondent commingled his funds with client funds in the following manner:
a) On January 25, 1989, a loan of $5,000.00 from Jean Bussman, the Respondent's bookkeeper, was deposited in the trust account.
b) On February 24, 1989, a loan of $15,407.79 from Rusty, a sometimes client of the Respondent, was deposited in the trust account.
c) In March 1989, the Respondent deposited $22,463.55, which he says was [sic] the proceeds from the sale of his home, in his trust account.
d) On August 28, 1989, the Respondent deposited $10,247.00, which he said was [sic] the proceeds from the sale of *564 some property he owned in Las Vegas, Nevada, into his trust account.
e) On November 9, 1989, $17,360.00 was deposited into the trust account and Respondent states this was the net proceeds from the sale of property on Manor Drive in St. Lucie County, Florida which he used to own.
The record shows by clear and convincing evidence that the respondent deposited loans from an employee and a former client and personal funds into the trust account. The record also reveals that from January 1, 1989, through June 30, 1990, the respondent made deposits in his trust accounts which were noted in the cash receipts journal as coming from personal funds totaling $187,881.27.
The referee found the respondent guilty of violating Rules Regulating The Florida Bar 3-4.2 (a lawyer shall not violate the Rules of Professional Conduct), 4-1.15(d) (a lawyer shall comply with the Rules Regulating Trust Accounts), and 4-8.4(a) (a lawyer shall not violate the Rules of Professional Conduct).

Count IV: Failure to Maintain Minimum Trust Account Records
The referee found that the respondent failed to keep the minimum required trust account records and failed to follow the minimum trust accounting procedures. In particular, the respondent failed: 1) to keep deposit slips from February 16, 1990 to the present which showed the date and source of trust account funds; 2) to keep a separate ledger card for each client or third party who entrusted the respondent to hold funds for a specific purpose; 3) to provide The Florida Bar's auditor with any trust account bank reconciliation or reconciliations of client ledger cards and trust account balances; 4) to properly identify the client matter for which the respondent issued a check in the cash disbursement journal; and 5) to conduct monthly and yearly bank reconciliations of his trust account.
The referee found the respondent guilty of violating Rules Regulating The Florida Bar 3-4.2 (a lawyer shall not violate the Rules of Professional Conduct), 4-1.15(d) (a lawyer shall comply with the Rules Regulating Trust Accounts), 4-8.4(a) (a lawyer shall not violate the Rules of Professional Conduct), 5-1.1(c) (a lawyer shall maintain trust account records and follow minimum trust accounting procedures), 5-1.2(b) (a lawyer shall maintain separate bank trust accounts, duplicates of deposit slips, canceled checks and other documentary support for disbursements and transfers from the trust account), and 5-1.2(c) (a lawyer shall follow minimum trust accounting procedures).

Count V: Charges as to a Second Account
The auditor also examined a second account in the respondent's name for the period beginning February 1, 1989 and ending June 30, 1990. An examination of this account showed that during the period reviewed by the auditor, the trust account had forty-four checks which the bank dishonored because of insufficient funds. Further, on numerous occasions the second account was in an overdraft position. In fact, during the entire month of May 1990, the bank balance was in an overdraft position. The referee noted that "[a]lthough the parties stipulated that `in at least three instances checks were issued from this account for client purposes' [The Florida Bar] failed to establish that said account was in fact used as an attorney/client Trust Account." The referee found that because The Florida Bar failed to establish that the respondent used the second account as a trust account, no ethical violations occurred. The Florida Bar does not appeal the referee's findings on this count.
The second case consolidated into the referee's report is The Florida Bar v. Simring, No. 78,243. In case No. 78,243, The Florida Bar charged the respondent with ethical violations stemming from his handling of client funds. The referee found that in March 1990, the respondent received a $45,000 settlement on behalf of Radcliff Barnett, a minor, whom the respondent had represented in a personal injury case. The respondent deposited this money into his trust account and was supposed to distribute the funds to pay for Barnett's medical and legal expenses. Because *565 Barnett was a minor, the respondent needed prior court approval before making any disbursements. The referee found that on the same day that the respondent received the Barnett settlement funds, the respondent made personal disbursements to himself, his family and creditors. Furthermore, the referee found that the respondent made these disbursements without the approval of the guardianship court, and that the disbursements had no nexus or connection to Barnett's personal injury claim.
The referee recommended that the respondent be found guilty of violating Rules Regulating The Florida Bar 3-4.2 (a lawyer shall not violate the Rules of Professional Conduct), 4-1.15(a) (a lawyer shall not commingle personal or firm funds with a client's funds), 4-1.15(b) (a lawyer shall promptly deliver to the client any funds the client is entitled to receive and provide a prompt accounting), 4-1.15(c) (a lawyer shall maintain client's property separate when the lawyer and another person claim an interest in the property), 4-1.15(d) (a lawyer shall comply with the Rules Regulating Trust Accounts), 4-8.4(a) (a lawyer shall not violate the Rules of Professional Conduct), and 5-1.1 (money entrusted to a lawyer for a specific purpose must be applied only to that purpose).
The referee, however, found the respondent not guilty of violating Rules Regulating The Florida Bar 3-4.3 (commission by a lawyer of any act which is unlawful or contrary to honesty and justice may be cause for discipline); 3-4.4 (criminal misconduct is cause for discipline); 4-8.4(b) (a lawyer shall not commit a criminal act); and 4-8.4(c) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit or misrepresentation).
Before addressing case Nos. 78,898 and 79,510, which concern the respondent's violations of this Court's emergency suspension order, we address issues raised by the respondent and The Florida Bar in case Nos. 77,351 and 78,243.
The law is well-established that in disciplinary proceedings, The Florida Bar must prove by clear and convincing evidence that an ethical violation occurred. The Fla. Bar v. Burke, 578 So.2d 1099 (Fla. 1991). The referee's function is to weigh the evidence, determine its sufficiency, and to make a factual finding. Id. This factual finding is presumed correct and will not be overturned unless the Court finds that it is clearly erroneous or lacking in evidentiary support. The Fla. Bar v. Scott, 566 So.2d 765 (Fla. 1990). Thus, in the instant case, the party seeking to overturn the referee's findings has the burden of showing that the referee's findings were clearly erroneous or lacking in evidentiary support.
The respondent makes two challenges to the referee's report. First, the respondent challenges the referee's factual findings that the respondent violated Rules Regulating The Florida Bar 4-1.15(b) (a lawyer shall promptly deliver to the client any funds which the client is entitled to receive and must provide a prompt accounting); 5-1.2(b) (a lawyer shall maintain separate bank trust accounts, duplicates of deposit slips, cancelled checks and other documentary support for disbursements and transfers from the trust account), and 5-1.2(c) (a lawyer shall follow minimum trust accounting procedures). Second, the respondent challenges the referee's qualification of The Florida Bar's auditor as an expert to testify concerning the trust account violations. We find that the respondent has failed to show that the challenged findings are clearly erroneous or lacking in evidentiary support. In addition, the respondent has failed to show that the referee committed an abuse of discretion in allowing The Florida Bar's auditor to testify as an expert. Johnson v. State, 393 So.2d 1069, 1072 (Fla. 1980), cert. denied, 454 U.S. 882, 102 S.Ct. 364, 70 L.Ed.2d 191 (1981). Thus, we uphold the challenged findings and the referee's decision to allow The Florida Bar auditor to testify.
The Florida Bar challenges the referee's findings that the respondent did not intentionally misappropriate his clients' funds in count I of case No. 77,351 and in case No. 78,243. In case No. 77,351, the referee's finding that the respondent did *566 not intentionally misappropriate his clients' funds is based on the premise that The Florida Bar only established "paper shortages" in the respondent's trust account because The Florida Bar failed to show that any client injury occurred. We find the referee's conclusion that The Florida Bar failed to show intent because no client injury or complaints occurred is clearly erroneous.
The instant case is factually similar to our decision in The Florida Bar v. McShirley, 573 So.2d 807 (Fla. 1991). In McShirley, this Court found a lawyer guilty of knowingly and intentionally misappropriating clients' funds when the amount of disbursements made to, or on behalf of the lawyer, exceeded the amount of funds commingled even though no client injury occurred. Similarly, in the instant case the respondent's disbursements made to himself or on his behalf exceeded the amount of commingled funds. Although McShirley is factually similar to the instant case, we recognize one distinction. Unlike the lawyer in McShirley, the respondent did not admit that he knew that the trust account contained shortages. The respondent argues that the shortages are the result of a bad case of commingling personal and trust account funds, not theft. We find, however, three facts when pieced together show a different picture. First, the record shows that the balance of the trust account had persistent shortages despite the deposit of the respondent's personal funds.[2] Second, the respondent admitted to paying personal obligations from this trust account. Third, the referee found that the exact extent of the respondent's misconduct will never be known because of his "sloppy and intentionally improper trust accounting procedures." These three facts of persistent shortages in the trust account, the respondent's constant use of the trust account funds to pay personal obligations, and his "intentionally sloppy and improper trust accounting procedures" establish an intent to misappropriate client funds. The respondent's "sloppy and intentionally improper trust accounting procedures" cannot be used as a shield to hide his intent to misappropriate trust account funds. Therefore, we find that The Florida Bar established by clear and convincing evidence that the respondent intentionally misappropriated his clients' funds.
The Florida Bar also challenges the referee's finding that the respondent did not intentionally misappropriate the Barnett settlement funds in case No. 78,243. The record shows that on March 5, 1990, the circuit court approved the settlement of Barnett's personal injury claim for $45,000. That same day the respondent deposited the $45,000 settlement funds into his trust account. The respondent testified that he deposited the settlement funds into his trust account because the guardianship court had not ordered a special depository for the funds or authorized any disbursements. The record shows that at the time of the deposit, the respondent's trust account had a preexisting shortage of approximately $8,000.
The record shows that from March 5, 1990 to May 30, 1990, the respondent wrote checks totaling $21,435.08 in reference to the Barnett settlement account. Although these checks referenced the Barnett settlement fund, the respondent used the money to pay personal and office obligations. The record shows that on March 5, 1990 the respondent wrote twelve checks totaling $11,574.38 for personal matters. The respondent paid the twelve checks to his family members and for personal obligations concerning car, insurance, and credit card payments. On March 6, 1990, the respondent wrote three additional checks totaling $2,880.00 to his wife, his bookkeeper, and another employee. On March 8, 1990, the respondent wrote two more checks, one to *567 himself for $3,000 and another to repay a personal loan of $375.00. On March 9, 1990, the respondent paid various office expenses totaling $1,485.70 from the Barnett settlement funds. Within four days of receiving the Barnett settlement, the respondent had dissipated $19,315.08 of the money. Moreover, the record shows that in April and May 1990, the respondent wrote three additional checks against the Barnett settlement totaling $2,120. None of these disbursements had the approval of the guardianship court, nor did the disbursements satisfy claims of Barnett's health-care providers.[3] At the end of May the respondent's trust account balance had a shortage of $67,727.16.
The respondent testified that he did not misappropriate the funds, but gave $35,000, representing the Barnett settlement funds less his legal fees and costs, to his friend Harold Rubalow. Rubalow, a retired New York lawyer, was to hold the settlement funds for the respondent. The respondent explained that he simultaneously deposited and withdrew the settlement funds from his trust account. He testified that he gave the $35,000 to Rubalow because the Internal Revenue Service had threatened to close out his trust account to collect back taxes. Moreover, he testified that he gave Rubalow the money in cash and did not obtain a receipt for the money in order to avoid leaving "a paper trail" for the Internal Revenue Service. Finally, the respondent testified that he had no idea where Rubalow deposited the money. Rubalow testified that he deposited the money into a safe deposit box, and that he returned the money to the respondent in August 1991.
We note that although the respondent testified that he withdrew the $35,000 in cash simultaneously with its deposit, there was no evidence to support his testimony. The auditor's reconciliation of the trust account does not reflect a $35,000 withdrawal from the trust account at or near the time of deposit. We find the respondent's testimony that he had "sufficient cash, well over a hundred thousand dollars in cash, from certain immigration cases to cover whatever was taken out of the trust account," is suspect, at best.[4] However, like the referee, we find that even if the respondent's version of his handling of the Barnett settlement funds is correct, his conduct "broke every rule in the book."
Even if the respondent did give Rubalow $35,000 from the Barnett settlement, the respondent testified that he did not give Rubalow the money until March 19, 1990. The facts in the record show that by March 9, 1990, the respondent had already made numerous disbursements to himself or for his benefit in reference to the Barnett settlement funds. Thus, we conclude that even under the respondent's version of the facts, he had already intentionally misappropriated other portions of the Barnett settlement funds prior to transferring the money to Rubalow.
We find that the record shows by clear and convincing evidence that the respondent violated Rules Regulating The Florida Bar 3-4.3 (commission by a lawyer of any *568 act which is unlawful or contrary to honesty and justice); 3-4.4 (criminal misconduct basis for discipline); 4-8.4(b) (a lawyer shall not commit a criminal act); and 4-8.4(c) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit or misrepresentation).
The next two cases, The Florida Bar v. Simring, No. 78,898, and The Florida Bar v. Simring, No. 79,510, concern the respondent's violation of this Court's order temporarily suspending him from the practice of law entered on January 14, 1991.
In case No. 78,898, the record shows that this Court found the respondent guilty of contempt for continuing to hold Barnett settlement funds in violation of this Court's emergency suspension order dated January 14, 1991. At the disciplinary proceeding concerning the respondent's handling of the Barnett settlement funds, the respondent testified that on or near March 19, 1990 he transferred, without documentation, $35,000 to his friend Rubalow. The respondent testified that he made this cash transfer as a method of hiding the Barnett settlement funds from the Internal Revenue Service which was seeking to collect back taxes from the respondent.
The record shows that on January 14, 1991, this Court ordered that the respondent be temporarily suspended from the practice of law. The order read in pertinent part that the respondent was:
3. To refrain from withdrawing any monies from any trust account.
4. To deposit into a specified trust account all sums received from the practice of law, whether as fees, costs, deposits, or trust funds, and to immediately advise Bar Counsel of the receipt and location of said funds.
5. To refrain from disbursing any monies held in any trust account without approval of a judicial referee appointed by this Court.
On March 12, 1991, the circuit court ordered the respondent to deposit all Barnett settlement funds into a "restricted account." On June 19, 1991, the circuit court approved and instructed a disbursement of Barnett settlement funds. The respondent testified that he was aware of these court orders.
In August 1991, Rubalow returned the $35,000 in cash to the respondent. The respondent testified that he ignored the court orders to deposit the money into a specified trust account, and instead kept the money hidden in his house. Further, the respondent testified that he did not give the money to the circuit court because at the time he received the money he was trying to leverage a former law partner into reimbursing him for personal funds that he had deposited into the trust account. The stipulation between the parties shows that the respondent satisfied the liabilities in the Barnett settlement on September 4, 1991. On January 14, 1992, this Court issued an order finding the respondent guilty of contempt because of his willful violation of the emergency suspension order. The Court, however, withheld discipline pending the disposition of case Nos. 77,351 and 78,243.
In the fourth consolidated case, No. 79,510, the referee found the respondent guilty of two more instances of contempt for violating this Court's emergency suspension order.[5] The record clearly shows that for over a year after his suspension the respondent's office door bore a sign that read as follows: "Ellis Simring, P.A." After The Florida Bar filed its Petition for Rule to Show Cause, the respondent removed the "P.A." from the door. However, the respondent left his name on the glass door alongside the names of other practicing lawyers and without any indication of his suspended status.
*569 During the trial, the respondent gave three conflicting versions as to why his name remained still on the glass door outside his office after he was suspended: 1) he did not notice his name on the door; 2) Neil Garfield, the lawyer who shared office space with the respondent, did not want to remove the respondent's name because it would smear the glass door; and 3) the owner of the building had failed to remove the sign. Without commenting on the respondent's various excuses, the referee found the office sign misleading to the public and in violation of this Court's order. The referee correctly found the respondent guilty of contempt for allowing his name to remain on the door without any designation of his suspended status. See The Fla. Bar v. Breed, 378 So.2d 783 (Fla. 1979); The Fla. Bar v. Brigman, 322 So.2d 556 (Fla. 1975).
The referee also found the respondent guilty of contempt for sending legal letters to a client without any designation of his suspended status. The record shows that the respondent represented Mildred Krause on a personal injury matter prior to his suspension. In February 1991, the respondent notified Krause about his temporary suspension. The respondent, however, continued to work on Krause's legal matter under the supervision of another lawyer. The record shows that the respondent mailed eight letters to Krause concerning her case. All of these letters, except the first letter, are on stationery from the Law Offices of Garfield & Associates, P.A., and are signed by the respondent without any indication as to his suspended status. The respondent's first letter to Krause is on letterhead stationery which states: Law Offices, Ellis S. Simring, Professional Association. Further, the first letter is signed by the respondent without any indication of his suspended status.
The respondent testified that he did not author or sign the letters. He contended that his secretary worked on the file at home and signed his name without his knowledge. However, the referee found that the letters were sent with the apparent consent or understanding of the respondent, and thus violated this Court's emergency suspension order. The referee correctly found the respondent guilty of contempt for corresponding with Krause without any designation of his status as a suspended lawyer. Breed, 378 So.2d 783; Brigman, 322 So.2d 556.
Finally, in No. 79,510, the referee rejected The Florida Bar's allegation that the respondent violated this Court's emergency suspension order by failing to notify two clients, Claudia Pagano and her father William Grande, about his suspended status. The Florida Bar attempted to show through the testimony of Martin Roth and Bernard Nardi and two letters written from Grande to the respondent that a lawyer-client relationship existed between the respondent and Pagano and Grande. However, the referee found that The Florida Bar "did not show by clear and convincing evidence that the [r]espondent represented Claudia Pagano or her father, William Grande, Esquire." The Florida Bar does not challenge this finding. The referee's conclusion that no lawyer-client relationship existed is supported by competent and substantial evidence.
In determining the appropriate discipline, the referee in case Nos. 77,351 and 78,243 found the following aggravating factors: 1) selfish motive by using client funds for personal purposes; 2) pattern of misconduct that continued for a period of one year or longer; 3) multiple offenses; 4) substantial experience in the practice of law; and 5) the vulnerability of Barnett, a minor. In mitigation, the referee considered the respondent's testimony of his mental strain because of medical, financial, and familial problems, and the fact that the respondent had no prior disciplinary record. The referee characterized the respondent's conduct as serious and demonstrating an "utter disregard for the law" and a "tremendous danger to the public." The referee stated that "[b]ecause of the respondent's sloppy and intentionally improper trust accounting procedures, the exact extent of his misconduct and resulting damage to his clients may never be known." Thus, the referee recommended an eighteen-month suspension *570 and assessment of the costs of the proceedings against the respondent.
In case No. 78,898, this Court withheld discipline until resolution of the pending discipline case. In case No. 79,510, the referee recommended that the respondent be suspended for six months and that the suspension be cumulative to any sanction given by the Court in case Nos. 77,351, 78,243, and 78,898. The referee noted, however, that the recommended sanction did not take into consideration non-final matters pending before the Court at the time.
In determining the appropriate discipline, we are guided by three purposes:
First, the judgment must be fair to society, both in terms of protecting the public from unethical conduct and at the same time not denying the public the services of a qualified lawyer as a result of undue harshness in imposing penalty. Second, the judgment must be fair to the respondent, being sufficient to punish a breach of ethics and at the same time encourage reformation and rehabilitation. Third, the judgment must be severe enough to deter others who might be prone or tempted to become involved in like violations.
The Fla. Bar v. Pahules, 233 So.2d 130, 132 (Fla. 1970). We find that the respondent's intentional and knowing misappropriation of clients' funds, his cumulative misconduct, and his continued contempt of this Court demonstrate an attitude that is a danger to the public and the legal profession.
The gravest of the respondent's offenses are the misappropriations of client funds found in case Nos. 77,351 and 78,243. The knowing and intentional misappropriation of client funds is among the most serious offenses that a lawyer can commit. The Fla. Bar v. Tunsil, 503 So.2d 1230 (Fla. 1986). This Court is not reluctant to disbar a lawyer for misappropriating client funds, even though no client is injured. See The Fla. Bar v. Shuminer, 567 So.2d 430 (Fla. 1990); The Fla. Bar v. Diaz-Silveira, 557 So.2d 570 (Fla. 1990). Moreover, there is a presumption that "[d]isbarment is appropriate when a lawyer intentionally or knowingly converts client property and causes injury or potential injury to a client." Standard 4.11 of the Florida Standards for Imposing Lawyer Sanctions (Fla. Bar Bd. of Governors, 1987); see also The Fla. Bar v. Shanzer, 572 So.2d 1382 (Fla. 1991). This presumption may be overcome by the presentation of significant mitigating circumstances. See McShirley, 573 So.2d 807. However, in the overwhelming number of recent cases, we have disbarred lawyers for misappropriation of funds notwithstanding the mitigating evidence presented. See Shanzer, 572 So.2d 1382; Shuminer, 567 So.2d 430; The Fla. Bar v. Golub, 550 So.2d 455 (Fla. 1989); and The Fla. Bar v. Fitzgerald, 541 So.2d 602 (Fla. 1989).
The referee found in mitigation that the respondent had no prior disciplinary record and that the respondent was under an emotional strain from financial and familial obligations. Although the respondent testified that he was under an emotional strain, we cannot excuse his intentional misappropriations as a means to solve life's problems. The Fla. Bar v. Graham, 605 So.2d 53 (Fla. 1992). We find that the mitigating circumstances in the instant case do not rebut the presumption of disbarment.
In the past, this Court has found that disbarment is an appropriate discipline when the "cumulative misconduct demonstrates an attitude and course of conduct that is inconsistent with Florida's standards for professional conduct." The Fla. Bar v. Williams, 604 So.2d 447, 452 (Fla. 1992). As we stated in The Florida Bar v. Bern, 425 So.2d 526, 528 (Fla. 1982), this "Court deals more harshly with cumulative misconduct than it does with isolated misconduct." The respondent's misappropriation of client funds, trust account violations, and continued contempt also shows an unfitness to practice law.
Finally, the Court has increased the length of a lawyer's suspension from the practice of law when the Court has found the lawyer guilty of contempt for violating the Court's order suspending the lawyer for misconduct. See The Fla. Bar v. Golden, 563 So.2d 81 (Fla. 1990) (lawyer serving *571 a ninety-day suspension suspended for an additional year for engaging in the unlicensed practice of law by "counseling and attempting to assist his client in requesting two continuances."). However, the Court has not been reluctant to disbar a lawyer who is found guilty of violating its orders. The Fla. Bar v. Bauman, 558 So.2d 994 (Fla. 1990); The Fla. Bar v. Dykes, 513 So.2d 1055 (Fla. 1987). As this Court stated in Bauman:
We can think of no person less likely to be rehabilitated than someone like respondent, who wilfully, deliberately, and continuously, refuses to abide by an order of this Court.
Bauman, 558 So.2d at 994.
Case No. 79,510 is factually similar to our decision in Brigman, 322 So.2d 556, where this Court found a lawyer in contempt for failing to remove his business sign, failing to give his clients notice of his suspended status, and continuing to use "attorney at law" stationery despite the lawyer's six-month disciplinary suspension.[6] In Brigman, the Court increased the lawyer's suspension by an additional six months. However, unlike Brigman, the respondent's misconduct also involves a third instance of contempt where the respondent continued to hold and disburse trust account funds after a Court order to deposit all trust funds into a restricted account. We find that the respondent's third instance is a serious violation and calls into question his ability abide by this Court's orders. In addition, the respondent has shown an unwillingness to accept responsibility for his violations. The respondent's various excuses show an unwillingness to accept responsibility for the consequences of his actions. We find that his contemptuous behavior demonstrates an attitude or course of conduct wholly inconsistent with approved professional standards, thus warranting disbarment. See Pahules, 233 So.2d at 131 ("[D]isbarment is the extreme measure of discipline and should be resorted to only in cases where the lawyer demonstrates an attitude or course of conduct wholly inconsistent with approved professional standards.") (quoting State ex rel. The Fla. Bar v. Murrell, 74 So.2d 221, 223 (Fla. 1954)).
Finally, we reject the respondent's argument that the referee improperly assessed the costs of the disciplinary hearing against him. The taxation of costs is within the discretion of the referee. The Fla. Bar v. Carr, 574 So.2d 59 (Fla. 1990). The respondent has failed to show that the referee's decision to assess costs is an abuse of discretion. Thus, we find that the total cost of the four disciplinary proceedings should be assessed against the respondent.
Accordingly, after a careful review of the record, we find that disbarment is warranted. Therefore, we disbar the respondent, Ellis S. Simring, pursuant to Rule 3-5.1(f) of the Rules Regulating the Florida Bar. The disbarment will be effective from the date of this Court's order dated January 14, 1991, temporarily suspending the respondent from the practice of law. Judgment is entered against the respondent for costs in the amount of $10,829.81 for which sum let execution issue.
It is so ordered.
OVERTON, McDONALD, SHAW, GRIMES, KOGAN and HARDING, JJ., concur.
BARKETT, C.J., recused.
NOTES
[1] Pursuant to recent rule changes, the "temporary suspension" is now referred to as an "emergency suspension." See Rule Regulating the Florida Bar 3-5.2.
[2] For example, in June 1989, the respondent deposited $19,021.65 of his personal funds into the trust account, yet the record shows that even with the deposit the trust account had a shortage of $38,821.40. In July 1989, the respondent deposited $86,938.39 of his personal funds into the trust account, and reduced the shortage to $18,498.03. In August 1989, the respondent deposited $4,894.00 of his personal funds into the trust account and the shortage increased to $39,776.37. Excluding November and December 1990, the trust account balance continued to show a shortage until the respondent closed the account.
[3] At the time the respondent made these withdrawals, the guardianship court had not approved any disbursements of the settlement funds. On June 17, 1991, after the respondent's temporary suspension, the guardianship court ordered that the $45,000 settlement be disbursed as follows:

Broward General Hospital $16,046.76
VNA Home Care 4,800.00
Dr. Amico 150.00
Broward Neurological 100.00
Atlantic Ambulance 2,200.00
Abbey Foster 153.00
N. Broward Radiology 750.00
Dr. Neubeiser 600.00
South Florida Imaging 200.00
Simring Legal Fee 6,747.88
Simring Legal Costs 3,252.12
Balance to Barnett 10,000.24
 __________
Total $45,000.00

The record shows that the respondent satisfied these Barnett liabilities on or near September 4, 1991. This action was taken after The Florida Bar filed it complaint on July 9, 1991, and over eighteen months after the respondent's misappropriation of Barnett settlement funds in March 1990.
[4] The facts show that the respondent used trust account funds to pay personal bills and office expenses. The respondent's use of the trust account to pay his personal bills is inconsistent with his explanation that he had large amounts of cash available.
[5] On January 14, 1991, this Court entered an order temporarily suspending the respondent from the practice of law. This Order required the respondent to stop practicing law by February 14, 1991. The referee recommended to the Court that the respondent be given an additional ten days before starting the emergency suspension. The Court never acted on this recommendation, thus the date of the respondent's suspension began February 14, 1991. The referee noted, however, that the respondent's misconduct in case No. 79,510 occurred well after February 1991.
[6] The record in the instant case shows that the respondent informed his clients of his temporary suspension. Thus, facts found in The Florida Bar v. Brigman, 322 So.2d 556 (Fla. 1975), are slightly different from the instant case. We find, however, that this distinction is not important in light of the respondent's violation of this Court's order by wrongfully holding trust account funds during his temporary suspension.